1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

NUBONAU, INC., etc.,

                                    Plaintiff,

        vs.

NB LABS, LTD, etc., et al.,

                                    Defendants.

CASE NO. 10cv2631-LAB (BGS)

**ORDER ON DEFENDANTS'
MOTIONS TO DISMISS**

        Still pending in this case are the Defendants' motions to dismiss for lack of personal jurisdiction.  Last October, after the motions had been filed but before NuboNau had opposed them, the Court allowed NuboNau to take limited discovery relating to the Defendants' jurisdictional arguments.  Specifically, the Court ordered Dotcom Retail to "respond to NuboNau's thirteen document requests and eight interrogatories to the extent they request information regarding contacts with California."  (Dkt. No. 24 at 9.)  It also ordered Cult Beauty to respond to NuboNau's document requests and interrogatories "with all responses limited to Cult Beauty's contacts in California."  (Dkt. No. 24 at 9.)  Finally, it ordered NB Labs to produce documents and answer interrogatories regarding its contacts

/ / /

/ / /

/ / /

both in California and the United States as a whole.[1]  After NuboNau had taken the discovery

allowed by the Court it filed an opposition to the motions to dismiss, to which Defendants

each filed a reply.

---

[1] NuboNau now claims that it "was not allowed to conduct jurisdictional discovery related to the Defendants' contacts with the United States generally" in order to establish jurisdiction under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2).  (Opp'n Br. at 3 n.1.) With respect to NB Labs, that's wrong.  With respect to Dotcom Retail and Cult Beauty, the Court would put the point differently.  There must be a colorable showing that personal jurisdiction exists before jurisdictional discovery is warranted, and NuboNau failed to make that showing with respect to the *national* contacts of Dotcom Retail and Cult Beauty.

The fact is that the Court gave a reasoned explanation for allowing NuboNau to take discovery only on the *California* contacts of Dotcom Retail and Cult Beauty:

> Without any evidence that Dotcom Retail has sold NUBO products outside of California in the United States, NuboNau has made no colorable showing that jurisdiction arises here pursuant to Rule 4(k)(2).  It is therefore not entitled to discovery on Dotcom Retail's contacts in the broader United States. Dotcom Retail does concede that it made sales outside of California. (Dkt. No. 19 at 2; Dkt. No. 8-2.)  But the number of such sales — three — is only marginally more significant than its California sales, and thus could not support a finding of national jurisdiction where there is no personal jurisdiction.  *Holland America*, 485 F.3d at 461.  Moreover, in correspondences with counsel for Dotcom Retail, counsel for NuboNau suggests that jurisdictional discovery of Dotcom Retail's contacts throughout the United States is necessary for "a determination of the best venue in the United States for this lawsuit."  This is not a valid basis for the nation-wide discovery NuboNau seeks, nor is the fact that Dotcom Retail invoked Rule 4(k)(2) in its motion to dismiss.  The fact is that NuboNau makes no showing whatsoever that jurisdiction is appropriate here under Rule 4(k)(2), and seeks relevant discovery only on the "bare allegation," in the face of denials by Dotcom Retail, that such jurisdiction exists. *Terracom*, 49 F.3d at 562.

> Finally, the Court notes that, in an email correspondence with counsel for NB Labs and Cult Beauty *after* the motions to dismiss were filed, counsel for NuboNau originally requested information "specifically related to your client's connections to California, including any efforts to market or sell its products to consumers in California."  No request was made for nationwide discovery, even though NuboNau was aware at the time that Defendants were arguing against federal jurisdiction under Rule 4(k)(2).  Jurisdictional discovery is warranted when "pertinent facts bearing on the question of jurisdiction are *controverted* . . . ." *Data Disc*, 557 F.2d at 1285 n.1 (emphasis added).  It's not warranted when a plaintiff has no facts to support jurisdiction and is simply in search of some.

(Dkt. No. 24 at 8.)

1    As with its request for jurisdictional discovery, NuboNau lumps the Defendants

2  together, at least in the "Legal Argument" portion of its opposition brief.  The Court will

3  address their motions to dismiss independently.  First, however, it will reiterate the relevant

4  jurisdictional standards.

5  **I.    Jurisdictional Standards**

6    When NuboNau first requested jurisdictional discovery, it suggested that the

7  Defendants' California contacts were adequate to establish the Court's personal jurisdiction

8  over them, but that in the alternative the Defendants' *national* contacts were adequate to

9  establish jurisdiction under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2).  It did not

10  distinguish between the Defendants:

11           Finally, NuboNau should be granted discovery not only to
             California contacts, but to all national contacts.  Although
12           NuboNau firmly believes that it can establish personal
             jurisdiction in California, should the Court find otherwise,
13           NuboNau could still maintain its federal claims based on
             Defendants' national contacts across the United States
14           collectively.  *See* Fed. R. Civ. P. 4(k)(2).  Where foreign
             defendants may otherwise have insufficient contacts with any
15           one state, the foreign defendants' contacts with the United
             States as a whole may be aggregated to establish personal
16           jurisdiction on claims arising under federal law.

17  (Dkt. No. 18-1 at 6.)  The Court's allowance of jurisdictional discovery forced NuboNau to

18  change that approach, at least as to Defendants Dotcom Retail and Cult Beauty.  Now,

19  because the Court limited NuboNau's discovery from these Defendants to information

20  regarding their contacts *in California*, NuboNau cannot argue that the Court has jurisdiction

21  over them under Rule 4(k)(2).  Instead, it argues strictly that jurisdiction over them exists "in

22  connection with the retail activities of [their] e-commerce business that clearly targets

23  California customers."  (Opp'n Br. at 11, 14.)  With respect to NB Labs, NuboNau appears

24  to rely only on Rule 4(k)(2).  It argues that "specific jurisdiction over NB Labs is proper for

25  claims directly related to its use of the Nubo mark within the United States in a manner that

26  is likely to cause confusion."  (Opp'n Br. at 9.)

27  / / /

28  / / /

1    The "Legal Argument" portion of NuboNau's brief confuses things, however, because

2    there NuboNau appears to argue that jurisdiction exists over *all* Defendants, not just NB

3    Labs, under Rule 4(k)(2) (even though its analysis is weighted heavily toward the Court's

4    jurisdiction over NB Labs).  Indeed, the major subheading in this section is titled "Under Fed.

5    R. Civ. P. 4(k)(2) This Court May Consider Each Defendant's Contacts With The Entire

6    United States."  (Opp'n Br. at 15.)  Anyway, the Court is assuming that NuboNau believes

7    specific jurisdiction exists over Dotcom Retail and Cult Beauty because of their *California*

8    contacts, while it exists over NB Labs under Rule 4(k)(2) because of its *national* contacts.

9    **A.    Specific Jurisdiction**

10    Three conditions must be satisfied to trigger the Court's specific jurisdiction over a

11    non-resident defendant.

12    (1) The non-resident defendant must purposefully direct his
activities or consummate some transaction with the forum or
13    resident thereof; or perform some act by which he purposefully
avails himself of the privilege of conducting activities in the
14    forum, thereby invoking the benefits and protections of its laws;

15    (2) the claim must be one which arises out of or relates to the
defendant's forum-related activities; and
16

17    (3) the exercise of personal jurisdiction must comport with fair
play and substantial justice, i.e., it must be reasonable.

18    *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th

19    Cir. 2006).

20    "Purposeful direction," the first condition[2], occurs where the defendant (1) commits

21    an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

22    defendant knows is likely to be suffered in the forum state.  *Id.* at 1206 (citing

23    *Schwarzenegger*, 374 F.3d at 802.  This test, which is traceable to the Supreme Court's

24

25    _____

    [2] The Ninth Circuit distinguished between "purposeful availment" and "purposeful

26    direction" in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).
An availment analysis, most often used in suits sounding in contract, looks for "evidence of

27    the defendant's actions in the forum, such as executing or performing a contract there."  *Id.*
at 802.  A direction analysis, most often used in suits sounding in tort, looks for "evidence

28    of the defendant's action outside the forum state that are directed at the forum, such as the
distribution in the forum state of goods originating elsewhere."  *Id.* at 803.  The Court will use
the "purposeful direction" analysis because a trademark action is more akin to a tort suit, and
indeed, the acts of Dotcom Retail at issue took place outside of California.

decision in *Calder v. Jones*, 465 U.S. 783 (1984), is an effects test that focuses on where a defendant's acts were *felt*, rather than where they actually occurred. *Yahoo! Inc.*, 433 F.3d at 1206. The "harm" required need not be the *brunt* of the harm of the defendant's acts. To the contrary, "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state." *Id.* at 1207.

The second condition — the claim must arise out of the defendant's forum-related activities — simply means that the defendant's alleged activities must be the "but for" cause of the claim. *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000).

Comportment with fair play and substantial justice, the third condition, requires the Court to consider several factors, including: (1) the extent of the defendant's purposeful interjection into the forum state; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum. *Id.* at 1088. Each factor must be considered, and none is dispositive. *Ziegler v. Indian River County*, 64 F.3d 470, 475 (9th Cir. 1995).

**B.   4(k)(2) Jurisdiction**

Rule 4(k)(2) "permits federal courts to exercise personal jurisdiction over a defendant that lacks contacts with any single state if the complaint alleges federal claims and the defendant maintains sufficient contacts with the United States as a whole." *Getz v. Boeing Co.*, 654 F.3d 852, 858 (9th Cir. 2011). For jurisdiction to arise under the Rule, the claim must arise under federal law, the defendant must not be subject to the personal jurisdiction of any state court of general jurisdiction, and the federal court's exercise of personal jurisdiction must comport with due process. *Holland America Line Inc. v. Wartsila North America, Inc.*, 485 F.3d 450, 461 (9th Cir. 2007). The due process analysis under Rule

1   4(k)(2) is nearly identical to the traditional personal jurisdiction analysis, the only difference

2   being that the focus shifts from contacts with the forum state to contacts with the nation as

3   a whole. *Id.* at 463 (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1159 (9th Cir. 2006)).

4   **II.    Dotcom Retail**

5          NuboNau alleges that "Dotcom Retail offers NUBO products for sale through its

6   website www.BeautyBay.com . . . which [is] accessed by consumers worldwide." (Compl.

7   ¶ 22.)   In opposing jurisdictional discovery Dotcom Retail argued that its only sales to

8   California were orchestrated by NuboNau's investigator, but one of Dotcom Retail's

9   argument for dismissal is that it isn't legally responsible for the BeautyBay website in the first

10  place.[3]  Rather, it owns the website's domain name (and trademark), and just licenses it to

11  a separate subsidiary company, BeautyBay.com Limited.  As Dotcom Retail sees it, then,

12  "Plaintiff has mistakenly identified an uninvolved company in its complaint." (Dkt. No. 8-1 at

13  1.)  The Court will bypass this alter ego issue because *even if* BeautyBay.com's contacts

14  with California could be attributed to Dotcom Retail the Court does not find them sufficient

15  to support personal jurisdiction here.

16         NuboNau's first charge against Dotcom Retail to establish specific jurisdiction — and,

17  specifically, to satisfy the "purposeful direction" condition — is that "Dotcom admits that

18  BeautyBay.com has sold NUBO products to customers in California . . . ." (Opp'n Br. at 12.)

19  That's rather misleading.  What Dotcom Retail admits is that it received two orders from

20  California, both of which "were apparently placed by agents of the Plaintiff." (Opp'n Br., Ex.

21  18 at 4.)  One was placed by an investigator with National Trademark Investigations, and

22  another was placed by NuboNau co-owner Hazel Walker.  The Court already ruled in its

23  order on jurisdictional discovery that "this kind of orchestrated purchase cannot give rise to

24  personal jurisdiction over Dotcom Retail in California." (Dkt. No. 24 at 7.)  *See Sinatra v.*

25  *National Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988) ("In order to have purposefully

26  availed oneself of conducting activities in the forum, the defendant must have performed

27  ─────────────────

28         [3] The Court acknowledged this in its order on jurisdictional discovery: "While Dotcom Retail's argument for dismissal is that it has no legal responsibility for the BeautyBay website, it appears willing to stand in the place of BeautyBay for the purpose of NuboNau's request for jurisdictional discovery." (Dkt. No. 24 at 7.)

some type of affirmative conduct which allows or promotes the transaction of business within the forum state."); *Edberg v. Neogen Corp.*, 17 F.Supp.2d 104, 112 (D.Conn. 1998) ("Only those contacts with the forum that were created by the defendant, rather than those manufactured by the unilateral acts of the plaintiff, should be considered for due process purposes.").

"In the internet context, the Ninth Circuit utilizes a sliding scale analysis under which 'passive' websites do not create sufficient contacts to establish purposeful availment, whereas interactive websites may create sufficient contacts, depending on how interactive the website is." *Jeske v. Fenmore*, 2008 WL 5101808 at *4 (C.D. Cal. Dec. 1, 2008) (citing *Boschetto v. Hansing*, 539 F.3d 1011, 1018 (9th Cir. 2008)). "[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the internet." *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419 (9th Cir. 1997) (quotation omitted). Here, Dotcom Retail's website isn't inherently passive — it is, after all, a website that consumers visit to buy products — but through the website Dotcom Retail has conducted virtually *no* commercial activity involving the NUBO products at issue. Under the Ninth Circuit's sliding scale, the Court finds no basis for jurisdiction when the only relevant commercial activity was both minimal and instigated by NuboNau. *See Life Alert Emergency Response, Inc. v. Lifealert Sec., Inc.*, 2008 WL 5412431 at *4 (C.D. Cal. Dec. 29, 2008) ("The mere maintenance of an interactive website, without consummated commercial activity, is not sufficient to establish specific jurisdiction over Defendant.").

NuboNau next cites a number of Dotcom Retail's activities in California that have *nothing* to do with the advertising or sale of NUBO-branded products. For example, between April 2009 and the commencement of this lawsuit, BeautyBay.com sold approximately 400 *non*-NUBO products worth approximately $40,000 to California residents. (Opp'n Br., Ex. 7 at BB 6–13; Ex. 18 at 4.) BeautyBay.com also sells the products of California-based companies other than NB Labs. (Opp'n Br., Ex. 18 at 4; Ex. 7 at BB 17–24.) And for approximately one month in the summer of 2009, an officer of BeautyBay.com visited

California to explore the possibility of creating a U.S. subsidiary, and as part of that effort he rented an apartment and met with attorneys, marketing agencies, and an insurance agent. (Opp'n Br., Ex. 18 at 5.)  The second condition for specific personal jurisdiction to exist bears repeating here.  NuboNau's claims against Dotcom Retail "must be one[s] which arise[ ] out of or relate[ ] to the defendant's forum-related activities."  *Yahoo! Inc.*, 433 F.3d at 1205.[4] NuboNau's claims, however, are trademark-based claims that revolve around the advertising and sale of NUBO products in California.  (*See* Compl. ¶¶ 22, 28, 33, 38, 43, 50, 56.)  The fact that Dotcom Retail has sold *other* products to customers in California, or has entered into commercial agreements with *other* California-based vendors, or generally explored the possibility of establishing a California presence, is a completely separate matter.  To put the point another way, the core claim of this trademark case is that consumers are likely to confuse the NUBO products sold by Dotcom Retail for NuboNau products.  In no way can that be considered a consequence of Dotcom Retail selling non-NUBO products to California residents, or a Dotcom Retail official visiting California and meeting with lawyers and an insurance agent to explore business opportunities.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1085 (C.D. Cal. 2003) ("Contacts with U.S. agents such as public relations representatives and lawyers . . . and the use of a California company . . . are simply not but for causes of the alleged infringement."); *Fujitsu-ICL Systems, Inc. v. Efmark Service Co. of Illinois, Inc.*, 2000 WL 1409760 at *5 (S.D. Cal. June 29, 2000) ("Here, Defendant's two meetings in California were not related to the negotiation or performance of the disputed contracts.").  Specific jurisdiction is "tethered to a relationship

---

[4] This is the point NuboNau misses in citing and relying on: (1) *Stomp, Inc. v. NeatO, LLC*, 61 F.Supp.2d 1074 (C.D. Cal. 1999); (2) *Allstar Marketing Group, LLC v. Your Store Online, LLC*, 666 F.Supp.2d 1109 (C.D. Cal. 2009); and (3) *Chanel, Inc. v. Lin*, 2010 WL 2557503 (N.D. Cal. May 7, 2010).  (*See* Opp'n Br. at 18–19.)  In *Stomp, Inc.*, a patent infringement case, the Northern District of California decided it had jurisdiction over a company that sold *the allegedly infringing products* over the internet to California residents. 61 F.Supp.2d at 1077 ("The products being sold on NeatO's website incorporate the technology of the '446 patent at issue.").  In *Allstar Marketing Group*, too, a trademark and copyright infringement case, a district court exercised personal jurisdiction over a defendant that operated "a highly commercial website through which regular sales of *allegedly infringing products* are made to customers in this state."  666 F.Supp.2d at 1122 (emphasis added).  Finally, specific jurisdiction in *Chanel, Inc.* wasn't premised on the defendant's sale of just *any* products in California, but on its use of an interactive website "to advertise and sell *infringing products*."  2010 WL 2557503 at *5 (emphasis added).

between the forum and *the claim*," not simply the forum and the defendant.  *Holland America*, 485 F.3d at 460 (emphasis added).

NuboNau also seizes on Dotcom Retails's internet advertising through Google to show California contacts that give rise to personal jurisdiction.  Specifically, Dotcom Retail admits that it pays Google for search engine results that send internet shoppers its way, that it has designated most of the world as its target market, and that "[t]raffic attributable to persons in California under Google's program and which is presumably in response to information which Google displayed to persons in California, accounts for approximately 0.11% of BeautyBay.com's total traffic attributable to Google's advertising program."  (Opp'n Br., Ex. 18 at 10.)  As the Court reads the internet traffic data submitted by NuboNau, BeautyBay.com has been visited 3,928,717 times *total*, and 34,296 times by California residents.  Of those 34,296 visits, 4,240 were click-thru visits for which Google was paid.[5]  (Opp'n Br., Ex. 7 at BB 25–27.)

To be clear, "no court has ever held that an Internet advertisement alone is sufficient to subject the advertiser to jurisdiction in the plaintiff's home state."  *Cybersell,* 130 F.3d at 414.  Rather, there must be something more "to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state."  *Id.*  That "something more" may be the individualized targeting of, or express aiming at, a forum resident.[6]  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006).  For example, in *Panavision Int'l v. Toeppen*, 141 F.3d 1316 (9th Cir. 1998), the Ninth Circuit found that an

---

[5] Citing the same data sheets, NuboNau interprets them to mean that "Google advertisements were displayed over 4 million times to US residents, and resulted in over twenty eight thousand click-thru visits to BeautyBay.com from US residents, with over four thousand of those click-thru visits from California residents."  (Opp'n Br. at 13.)  The Court does see that BeautyBay.com received over 28,000 click-thru visits from the United States, but it doesn't see the basis for NuboNau's assertion that Google ads for BeautyBay.com were displayed 4 million times to residents of the United States.

[6] It can also be the fact that the plaintiff and defendant are competitors *and* the defendant knows that the forum state is the plaintiff's principal place of business.  *See The Bear Mill, Inc. v. Teddy Mountain, Inc.*, 2008 WL 2323482 at *6 (D. Idaho May 7, 2008) ("The fact that the parties are competitors in the teddy bear and franchise business, coupled with Defendant's knowledge of the location of Plaintiffs' business, begs the question as to whether the 'something more' requirement under the 'effects' test is satisfied.  Given the confluence of such factors, jurisdiction should be recognized here.").  This principle is not implicated in this case, at least as between NuboNau and Dotcom Retail.

Illinois-based cybersquatter who registered a California company's trademark as part of a domain name could be sued in the Central District of California because the cybersquatter actually demanded money from the plaintiff in order to release the domain name.  The Court does not believe that the minimal fraction of Dotcom Retail's *worldwide* Google-based advertising that appeared on computer screens in California is sufficient to establish that Dotcom Retail "purposefully directed" its actions to California.  The Google ads are akin, in the Court's judgment, to ads in national publications that simply happen to make their way into California, and courts have consistently held this not to constitute "purposeful direction." *See Neuromechanical, LLC v. Kiro Kids Pty. Ltd.*, 2011 WL 333337 at *3 (D. Ariz. Jan. 31, 2011) (collecting cases).[7]  Just because a foreign act has foreseeable effects in a forum state does not mean specific jurisdiction there is appropriate.  *Bancroft*, 223 F.3d at 1087.

This isn't to say that internet advertising can't ever constitute "purposeful direction" for jurisdictional purposes.  It can, but there must be more than the click-thru Google advertisements seized on by NuboNau here.  For example, in *Park Inns Int'l v. Pacific Plaza Hotels, Inc.*, an Arizona district court exercised jurisdiction over an Oakland hotel in a trademark infringement action because of its online advertisements, but those advertisements: (1) included the allegedly infringing trademark; and (2) actually resulted in the transaction of business.  5 F.Supp.2d 762 (D. Ariz. 1998).  Neither of these things can be said of BeautyBay.com advertisements prompted by Google searches in California.  Another way to put this point, of course, is to make it less about "purposeful direction" and more about whether NuboNau's claims actually arise out of Dotcom Retail's contacts in California.  Considering that Dotcom Retail made only two sales of NUBO products in California (both orchestrated by NuboNau), and that the Google ads, presumably, merely directed internet browsers to BeautyBay.com's website and not to particular NUBO product pages, it's hard to argue that the alleged infringement *arises out of* the Google ads.  *See also Advice*

---

[7] Just as "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State," an internet advertisement that happens to pop up in a forum state isn't necessarily purposefully directed there.  *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 112 (1987).

*Company v. Novak*, 2009 WL 210503 (N.D. Cal. Jan. 23, 2009) (no specific jurisdiction in a trademark case filed against an Arizona company in California *even where* Internet banner and link ads and nationwide mailings reached California *and* advertisements were placed in a California magazine).

Finally, NuboNau calls to the Court's attention the fact that Dotcom Retail "also uses a Twitter account and a Facebook account to promote its business," and that it has agreed to litigate all lawsuits arising out of these accounts in California. (Opp'n Br. at 13.) First, in case NuboNau means to suggest that merely having a commercial relationship with a California company subjects Dotcom Retail to this Court's jurisdiction, it is mistaken. The Supreme Court addressed that argument squarely in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985): "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot." *Id.* at 478. Where the commercial relationship isn't even with the plaintiff, the Supreme Court's holding in *Burger King* would seem to be even stronger. As for the choice-of-law provision in Dotcom Retail's user agreements with Twitter and Facebook, *Burger King* also recognized that this, on its own, cannot confer jurisdiction in the state whose law is specified. *Id.* at 482. *See also Fujitsu*, 2000 WL 1409760 at *5 (noting that "the mere fact that a state's law can be properly applied to a dispute does not necessarily confer personal jurisdiction over the parties in the state's courts"). With *Burger King* in mind, the Court doesn't find that merely engaging Twitter and Facebook to promote one's business constitutes purposeful direction at California, simply because Twitter and Facebook happen to be based there and require users to litigate all lawsuits arising out of their accounts in California.[8] To the extent NuboNau disagrees, the

---

[8] The Court finds particularly instructive the Central District of California's treatment of an argument similar to NuboNau's in *Life Alert*, 2008 WL 5412431 at *4. The Court will quote that decision at length because it is precisely on point here.

> Plaintiff also points to the fact that Dr. Arkinstall has been using Google Analytics, a service of the California-based Google, Inc., since January 2007 to generate reports regarding user activity on the website. Google Analytic's Terms of Service requires users to submit disputes arising from its use of the service to the jurisdiction of the courts in Santa Clara, California and it provides

- 11 -

1   Court would simply proceed to the second condition of the specific jurisdiction analysis and

2   find that NuboNau alleges nothing in particular about Dotcom Retail's activities on Twitter and

3   Facebook to support a finding that its alleged trademark infringement arises out of those

4   activities. To the contrary, NuboNau simply argues, generally, that Dotcom Retail uses the

5   social media platforms to "promote its business." (Opp'n Br. at 13.)

6           For the above reasons, the Court finds no basis for exercising specific jurisdiction

7   over Dotcom Retail. NuboNau has not shown the kind of "purposeful direction" on Dotcom

8   Retail's part that is the first condition of such jurisdiction, nor has it even argued that its actual

9   trademark-based claims arise out of acts that it believes constitute "purposeful direction."

10  NuboNau points to no authority that supports jurisdiction on the particular facts it alleges, and

11  the authority consulted by the Court counsels the opposite result. *See, e.g.,*

12  *Schwarzenegger*, 374 F.3d at 802–07; *Cybersell*, 130 F.3d at 419–20; *Advice Co.*, 2009 WL

13  210503 at *16; *Fujitsu*, 2000 WL 1409760 at *6–7.[9] Dotcom Retail's motion to dismiss for

14  lack of personal jurisdiction is therefore **GRANTED**.

15  **III.    Cult Beauty**

16          The above analysis of the Court's specific jurisdiction over Dotcom Retail should make

17  it clear where the analysis with respect to Cult Beauty is headed. NuboNau alleges the

18  following California contacts. First, Cult Beauty twice sold NUBO products in California, both

19  _____

20              that their relationship with Google is governed by California law.
21              Since Defendant agreed to those terms, Plaintiff argues,
            Defendant should be deemed to have invoked the protection
22              and benefits of California law. That argument is not convincing,
            because that agreement does not apply to disputes that are
23              unrelated to one's use of Google Analytics. More importantly,
            Plaintiff's claim does not arise out of Defendant's "contract" with
24              Google. Defendant's use of Google has nothing to do with the
            activity that gave rise to this trademark action—Defendant's
25              attempt do [sic] business with California and United States
            residents.

26          [9] The Court has already determined that *general* personal jurisdiction couldn't be
27  established in this case. (Dkt. No. 24 at 2–3 ("The Defendants are all based in the United
    Kingdom, and there is no indication whatsoever that their operations in California or any
28  other state, if any, are so continuous and substantial that they can be said to be physically
    present there.").) NuboNau seems to concede this. (Opp'n Br. at 16 ("Second, NuboNau
    asserts that none of the Defendants are subject to the courts of general jurisdiction of any
    state.").)

times to an investigator with National Trademark Investigations.  (Dkt. No. 12-1 at 3.)

Second, Cult Beauty stocks and sells products from three California-based companies: (1)

Neil George Hair Care, a Beverly Hills Salon; (2) Jouer, a Los Angeles cosmetics company;

and (3) Fix Malibu, a Malibu skincare company.  (Opp'n Br, Ex. 10 at 5; Ex. 8 at CB 13–29.)).

Third, Cult Beauty has made 74 sales of non-NUBO products to California residents, totaling

approximately $10,000.  (Opp'n Br., Ex. 10 at 6; Ex. 8 at CB 1–3.)  Fourth, Cult Beauty has

an email subscriber list, to which 155 California residents subscribe.  (Opp'n Br., Ex. 10 at 6.)

And fifth, like Dotcom Retail, Cult Beauty has a Twitter and Facebook account.  (Opp'n Br,

Ex. 12 at 8.)  For the same reasons given above with respect to Dotcom Retail, the Court

finds a lack of purposeful direction on Cult Beauty's part.  Moreover, none of the contacts

seized upon by NuboNau are the "but for" cause of Cult Beauty's alleged trademark offenses,

and so NuboNau's claims cannot be said to arise out of those contacts as is required for the

Court to base its exercise of specific jurisdiction upon them.  Cult Beauty's motion to dismiss

for lack of personal jurisdiction is **GRANTED**.

## IV.    NB Labs

NB Labs is the Defendant NuboNau is most eager to bring into this Court, and its

contacts with the United States are certainly more substantial than those of Dotcom Retail

and Cult Beauty, who simply sell NUBO products online.  The Court will first lay out, in no

particular order, NB Labs' alleged contacts with the United States.  Second, it will discuss an

exchange between NB Labs and NuboNau in which NuboNau warned NB Labs of its

trademark in the United States.  Third, it will determine whether jurisdiction is appropriate

under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2).

### A.    NB Labs' Contacts

*First*, NuboNau claims that "NB Labs admits that its resellers have sold Nubo brand

products into California."  (Opp'n Br. at 5.)  The Court has addressed this above.  The only

sales of NUBO products in California were orchestrated by NuboNau's investigator from

National Trademark Investigations.  NB Labs provides firm evidence of this in its motion to

dismiss.  (*See* Dkt. No. 11-1 at 3–4.)

*Second*, NuboNau points out that five NUBO products are manufactured in Florida. NB Labs concedes this.  The products are indeed manufactured by a third party company based in Florida with whom NB Labs has had a relationship since 2007, and they are shipped to the United Kingdom for packaging and resale.  (Opp'n Br, Ex. 5 at 7–8.)  NUBO products say "Made in USA" on their packaging.  (Opp'n Br., Ex. 21.)

*Third,* NB Labs maintains two websites, www.nblabs.com and www.nubobeauty.com, and the latter has been visited just under 3,000 times from within the United States, with over 700 of those visits made by California residents.  (Opp'n Br., Ex. 6 at NB Labs 279.)

*Fourth*, referencing documents produced by NB Labs that it cannot make complete sense of (nor can the Court), NuboNau claims that NB Labs engaged in some online advertising, and that its ads popped up on computers in the United States over 2 million times and were actually clicked on over a thousand times.  (Opp'n Br., Ex. 6 at NB Labs 282.) NuboNau claims, in addition, that NB Labs' online ads were "targeted at the United States," but this appears as a mere conclusory allegation for which the Court doesn't see any direct evidence in the documents produced by NB Labs.

*Fifth*, NB Labs contacted a consulting firm in the United States to advise it on entering the United States market through high-end retail stores.  This firm was The Krysalis Group, and it submitted a marketing proposal to NB Labs on February 17, 2010.  (Opp'n Br., Ex. 6 at NB Labs 60–64.)  NB Labs never engaged The Krysalis Group, however, and explains that "no marketing or promotion was initiated."  (Opp'n Br., Ex. 5 at 10.)  In addition, an employee of NB Labs emailed a NUBO "brand presentation" to an employee of NuboNau on August 12, 2010 and acknowledged that NB Labs was in the process of engaging a public relations agency in the United States and launching its products at Henri Bendel and The Plaza Hotel in New York City.  (Walker Decl., Ex. 1 at 5.)

*Sixth*, NuboNau argues that "emails produced by NB Labs show that between September 2010 and January 2011, an NB Labs employee named Rachel Wiener, using the email address rw@nblabs.com, was working in the United States to make contact with high-end skincare buyers from major US retailers such as Neiman Marcus and Nordstrom on NB

Labs' behalf." (Opp'n Br. at 7.)  That's a little bit misleading.  Emails produced by NB Labs show that Ms. Wiener had sparked the interest of United States buyers in NUBO, and on September 13, 2010 she provided their mailing addresses to NB Labs so that product samples could be sent to them. (Opp'n Br., Ex. 6 at NB Labs 43.)  On September 28, having heard nothing, Ms. Wiener sent a follow-up email asking about the status of the samples. (Opp'n Br., Ex. 6 at NB Labs 43.)  On November 9, 2010, Marina Shcherbinina, the CEO of NB Labs, replied to Ms. Wiener that  the samples hadn't been sent because of "a problem with TM registration." (Opp'n Br., Ex. 6 at NB Labs 46.)  Almost two months later, on January 7, 2011, Ms. Shcherbinina told Ms. Wiener over email that NB Labs' lawyer had advised that no products be shipped to the United States, even for personal use. (Opp'n Br., Ex. 6 at NB Labs 48.)[10]

*Seventh*, in August and early September of 2009, Ms. Shcherbinina was in contact with a cosmetics buyer from Bergdorf Goodman in New York City, Patricia Saxby, about presenting the NUBO brand to Ms. Saxby and discussing an exclusive United States launch of NUBO at Bergdorf.  They scheduled a meeting for September 15, 2009. (Opp'n Br., Ex. 6 at NB Labs 53–59.)  Ms. Shcherbinina planned on being in the United States at this time for "HBA," which the Court presumes is some kind of beauty industry trade show. (Opp'n Br., Ex. 6 at NB Labs 56.)  NB Labs sent sample NUBO products to Ms. Saxby on October 16, 2009. (Opp'n Br., Ex. 6 at NB Labs 175.)  On this same trip, Ms. Shcherbinina met with The Plaza Hotel. (Opp'n Br., Ex. 5 at 10.)

*Eighth*, in 2009 NB Labs shipped sample NUBO products to Vogue magazine, a spa called Bliss, and Fred Segal, a high-end retail store in California.  As the Court reads the UPS records produced by NB Labs, Vogue's shipment went out on June 5, 2009 and the other two went out on June 22, 2010.[11]  (Opp'n Br., Ex. 6 at NB Labs 168, 172, 173.)  NB Labs

---

[10] Also, NB Labs explains that Ms. Wiener was an independent contractor, not an employee of the company, and that she didn't promote the NUBO brand as much as seek potential opportunities for it.  (Reply Br. at 8.)  The Court doubts this makes a substantial difference in the analysis.

[11] NB Labs suggests that all shipments went out in 2009, but the Court reads the UPS records for the shipments to Bliss and Fred Segal differently.  (*See* Opp'n Br. at 6.)

concedes that it contacted Fred Segal about launching its products, but explains that it never received a response.  (Opp'n Br., Ex. 5 at 5.)

*Ninth*, in July of 2010 NB Labs attended a beauty industry trade show in Las Vegas called Cosmoprof.  (Opp'n Br., Ex. 5 at 8.)   There, samples of NUBO products were distributed to approximately seven retail vendors, including The Plaza Hotel, Fred Segal, Henri Bendel, and Bliss.  (Opp'n Br., Ex. 5 at 9.)  After the trade show, NB Labs discussed the possibility of launching its products with Beauty Collection, another company with which it met in Las Vegas.  (Opp'n Br., Ex. 5 at 5.)

*Tenth*, like Dotcom Retail and Cult Beauty, NB Labs has a Twitter account.  (Opp'n Br., Ex. 6 at NB Labs 189–278.)  According to NuboNau, NB Labs "has aggressively promoted its Nubo brand worldwide using its Twitter account, including within the United States." (Opp'n Br. at 8.)

### B.    Notice of Trademark

Sometime in late 2008, but perhaps early in 2009, NB Labs applied to register its NUBO trademark in the United States.  (Dkt. No. 11-2, Shcherbinina Decl. ¶ 9.)  The United States Trademark Office denied NB Labs' application because of NuboNau's preexisting trademark on July 29, 2010.[12]  Aware of this, NuboNau's president Phillip Walker instructed an employee named  Clemence Coussy in early August of 2010 to "contact NB Labs directly to ask for details regarding the NB Labs product including availability and supply to retailers in the United States."  (Opp'n Br., Walker Decl. ¶ 6.)  Paul Sillence, in charge of international sales for NB Labs, responded to Mr. Coussy's email on August 12, 2010.  Mr. Sillence attached a NUBO brand presentation and acknowledged that NB Labs was in the process of engaging a United States-based public relations firm.  He also told Mr. Coussy he had just returned from New York "where we are planning a launch at Henri Bendel in January and also the Plaza Hotel."  (Opp'n Br., Walker Decl., Ex. 1.)  Mr. Sillence noted that NB Labs had a

---

[12] If NuboNau has included this denial in the record, the Court cannot locate it.  The Court simply trusts Paul Walker's declaration on this point.  (Opp'n Br., Walker Decl. ¶ 5.) It takes the July 29, 2010 date from an email sent by Philip Walker to Paul Sillence.  (*See* Opp'n Br., Walker Decl., Ex. 4.)

"US warehouse in Boston" and could "invoice in US dollars." (Opp'n Br., Walker Decl., Ex. 1.) To be clear, this was on August 12, 2010.

On August 18, 2010, not even a week after Mr. Sillence responded to Mr. Coussy, Mr. Walker emailed Mr. Sillence, who apparently is an acquaintance. (Opp'n Br., Walker Decl., Ex. 4.) The purpose of Mr. Walker's email was to flag NuboNau's trademark in the United States and suggest that NUBO either avoid the market or else enter it with a different brand name:

> We have spent a considerable amount of time and money securing our trademarks and brand name in the US. We understand that Nubo has applied for a trademark in the US. On 29 July 2010 the US Trademark authorities raised concerns about your proposed trademark on the grounds that the name Nubo is too similar to NuboNau, and would cause confusion to the consumer . . .
>
> It is our view that the names are too similar and that given the investment we have made and the level of professional advice we have had to secure our trademarks, we would vigorously defend our trademarks. I am hoping that we might have raised the issue in enough time for both of us to avoid what would no doubt be at the least very expensive legal bills, and at worst significant financial damage for one of us . . .
>
> No doubt you will need to decide what is best for your company. Hopefully the issue can be resolved with the minimum cost for all parties concerned, I just wanted to flag the issue to you as soon as possible.

(Opp'n Br., Walker Decl., Ex. 4.) Ms. Shcherbinina replied to Mr. Walker by email on September 14, 2010. NuboNau describes this email as "stating that she continues to plan to launch her product in the United States despite NuboNau's assertions of infringement." (Opp'n Br. at 4.) That paints an incomplete picture of Ms. Shcherbinina's lengthy and at points conciliatory email. Ms. Shcherbinina did indeed say that launching NUBO products in the United States "is still our plan," and that she considered NuboNau's legal case "not that strong." But she also expressed an interest in minimizing confusion between NuboNau and NUBO products, proposed to differentiate however possible to co-exist, and invited NuboNau to enter the European market where NUBO's trademark was well-established. (Opp'n Br.,

/ / /

Walker Decl., Ex. 5.) Ms. Shcherbinina also indicated that she hadn't heard of NuboNau until Mr. Walker's August 18, 2010 email.

On September 15, 2010, the day after Ms. Shcherbinina emailed Mr. Walker, he acknowledged receipt of her email and said he would be in touch in due course. (Opp'n Br., Walker Decl., Ex. 6.) As of September 27, 2010, however, he hadn't responded, and on that date Ms. Shcherbinina sent a follow-up email in which she noted that NUBO's European trademark preceded that of NuboNau, that "the EU trade mark office did not regard the two trade marks as confusingly similar," and that if NuboNau objected to NUBO's registration in the United States NB Labs would attempt to invalidate NuboNau's European trademark. (Opp'n Br., Walker Decl., Ex. 6.)

It is worth noting that all of NB Labs' attempts to enter the United States market, which are really the core of NuboNau's argument that specific jurisdiction exists under the federal long-arm statute, *preceded* Mr. Walker's August 18, 2010 email to Ms. Shcherbinina in which NB Labs learned of NuboNau's United States trademark for the first time: (1) reaching out to The Krysalis Group (February 17, 2010); (2) attempting to launch NUBO products with Henri Bendel (August 12, 2010); (3) contacting a cosmetics buyer with Bergdorf Goodman (September 15, 2009); (4) shipping samples of Nubo products to Vogue, Bliss, and Fred Segal (June of 2009 and June 22, 2010); and (5) attending the Cosmoprof trade show in Las Vegas (July of 2010).

NuboNau tries to argue that Ms. Wiener was soliciting NUBO buyers in the United States *after* August 18, 2010, but that's not exactly right. (*See* Opp'n Br. at 7, 9 ("These facts also show that as recently as January 5, 2011, long after NB Labs received notice of this claim and even after this lawsuit was filed, NB Labs was still employing a US-based sales person to promote the Nubo products.").) It is true that on September 13, 2010, *after* Ms. Shcherbinina had seen Mr. Walker's August 18, 2010 email and one day before she responded to it, Ms. Wiener checked in on the status of samples to be sent to promising accounts in the United States. (Opp'n Br., Ex. 6 at NB Labs 43.) However, in two emails to Ms. Wiener on the subject, first on November 9, 2010 and then on January 7, 2011, Ms.

1   Shcherbinina was clear that a trademark issue had sprouted that was stalling the sale of

2   NUBO products in the United States.  (Opp'n Br., Ex. 6 at NB Labs 46, 48.)   Indeed,  after

3   August 18, 2010 NB Labs repeatedly told potential customers in the United States that its

4   products were unavailable in the United States and could not be shipped there.  (*See, e.g.,*

5   Opp'n Br., Ex. 6 at NB Labs 71–97.)  It also told its resellers not to sell to customers in the

6   United States.  (Opp'n Br., Ex. 6 at NB Labs 98–103.)

7   **C.    Discussion**

8          To revisit the legal standard, the Court may exercise specific jurisdiction over NB Labs

9   only if (1) it purposefully directed its activities toward the United States; (2) NuboNau's claims

10  against it arise out of those activities; and (3) the exercise of personal jurisdiction is

11  reasonable.  *Yahoo! Inc.*, 433 F.3d at 1205–06.  The focus is on contacts with the United

12  States as a whole, rather than contacts strictly with California, because NuboNau asserts that

13  jurisdiction arises under the federal long-arm statute, Fed. R. Civ. P. 4(k)(2).  *Holland*

14  *America*, 485 F.3d at 461.

15         It's clear to the Court, up front, that several contacts highlighted by NuboNau should

16  not even enter into the analysis, for reasons the Court either gave in its previous order on

17  jurisdictional discovery or in this Order with respect to its specific jurisdiction over Dotcom

18  Retail and Cult Beauty.  Those contacts are: (1) the orchestrated sales of NUBO's products

19  from Dotcom Retail and Cult Beauty to NuboNau's investigator; (2) the fact that NUBO

20  products are manufactured in Florida; (3) NB Labs' websites[13] and its online advertising; and

21  (4) NB Labs' Twitter account.  Either those contacts do not constitute purposeful direction at

22  the United States (or purposeful availment of the privilege of conducting business in the

23  United States), or it cannot plausibly be said that NuboNau's trademark-based claims arise

24  out of those contacts.  What distinguishes NB Labs' contacts from those of the dismissed

25  retail Defendants, and what NuboNau makes really the biggest deal out of, are NB Labs'

26  _____

27         [13] NB Labs may have an even better argument than Dotcom Retail and Cult Beauty
28  that its website isn't purposefully directed towards the United States because it lists prices
    in pounds sterling and includes a charge for the United Kingdom's VAT tax. (Dkt. No. 11-2,
    Shcherbinina Decl. ¶ 5.) NB Labs also claims that its website "states that NB Labs does not
    ship to the United States."  (Dkt. No. 41 at 4.)

attempts to enter the United States market. Having narrowed the discussion to those contacts, the question before the Court is whether a company's *pre*-market contacts with a forum, as it were, can give rise to specific jurisdiction over the company in that forum.

### 1.    Purposeful Direction

Purposeful direction, as noted above, requires that a defendant commit an intentional act, expressly aimed at the United States, that causes harm the defendant knows is likely to be suffered in the United States. The second and third prongs of the requirement — express aiming and harm — are sometimes collapsed into one. *See, e.g., Bancroft*, 223 F.3d at 1087 (deducing that the "express aiming" requirement "is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state"); *Wine Group LLC v. Levitation Management, LLC*, 2011 WL 4738335 at *6 (E.D. Cal. Oct. 6, 2011) (noting that courts have considered whether the defendant individually targeted a plaintiff known to be a forum resident in evaluating whether online activity is expressly aimed at a forum).

The Court has no problem with NuboNau arguing that NB Labs' exploration of the United States market — reaching out to The Krysalis Group, communicating with a cosmetics buyer at Bergdorf Goodman, sending samples to Vogue, Bliss, and Fred Segal, attending Cosmoprof in Las Vegas, and working with Ms. Wiener to establish accounts in the United States — was comprised of intentional acts. That's uncontroversial. The far more troubling argument is that NB Labs caused harm *that it knew* NuboNau was likely to suffer in California. NuboNau claims "there are some contested facts regarding when NB Labs first became aware of the NuboNau mark," but the Court doesn't know what those are. To the contrary, it seems *un*contested that prior to August of 2010 NB Labs was feeling out the United States, and that after Mr. Walker emailed Mr. Sillence on August 18, 2010 NB Labs abandoned those efforts. Thus, all NuboNau can point to are NB Labs' exploratory efforts, which the Court finds are not the kind of "expressly aimed" intentional acts that can constitute purposeful direction. *See One True Vine v. Liquid Brands*, 2011 WL 2148933 at *5 (N.D. Cal. May 31, 2011) ("The Court is unaware of any authority—and Plaintiff has failed to cite any—for the

proposition that sending samples of a product to a prospective distributor is sufficient to meet the express aiming requirement.").  They are more like *attempted* purposeful direction.

Even if the Court were to accept that NB Labs' attempts to enter the United States market constituted "purposeful direction," it would find that NuboNau's claims do not arise out of those attempts.  Against this, NuboNau argues that "but for NB Labs' efforts to expand into the United States market . . . there could be no confusion or harm to NuboNau's goodwill." (Opp'n Br. at 24.)  The "confusion" only arises, however, when an allegedly infringing good actually makes its way to the market and stands a chance of perplexing customers as to its corporate or brand origin.  Likewise, the distinctive quality of NuboNau's trademark can't be diluted or harmed by a good that doesn't make its way into the stream of commerce in the United States in the first place.

Each of NuboNau's claims against NB Labs, as the Court has already noted, presumes that NUBO products were actually sold or available for sale in the United States and in consumers' lines of sight.  Its trademark infringement claim alleges that "NB Labs' use of 'NUBO' . . . is likely to cause confusion among consumers as to the source of NB Labs' . . . products." (Compl. ¶ 33.)  Its false designation claim alleges the same thing.  (Compl. ¶ 38.) Its trademark dilution claim alleges that "NB Labs' use of 'NUBO' in connection with its products . . . is causing dilution of the distinctive quality of the NUBONAU Marks." (Compl. ¶ 43.)  Its second trademark dilution claim alleges that NB Labs' use of "NUBO" as a trademark "is causing NuboNau monetary damage and irreparable harm and resulting in Defendants' enrichment." (Compl. ¶ 50.)  Its unfair competition claim alleges the same thing.  (Compl. ¶ 56.)  Its false advertising claim alleges that NB Labs claims its products are all natural and organic when in fact they are not.  (Compl. ¶ 63.)  The point here is that none of these claims arise out of the *pre*-market contacts on which NuboNau tries to establish jurisdiction. NuboNau cannot seriously argue, for example, that NB Labs' conversations with The Krysalis Group, or its mere shipment of product samples to Vogue, or its conversations with a cosmetics buyer for Bergdorf Goodman, is likely to cause confusion *among consumers*
/ / /

as to the source of its products.[14]  None of NB Labs' attempts to enter the United States market, in other words, are the but for cause of NuboNau's alleged injuries.

In light of the above, the Court finds no purposeful direction here on the part of NB Labs, and its motion to dismiss for lack of personal jurisdiction is therefore **GRANTED**.

## V.   Conclusion

The Defendants' motions to dismiss are **GRANTED.**  The Clerk shall close this case.


**IT IS SO ORDERED**.

DATED:  March 9, 2012

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

---

[14] Probably the best argument NuboNau can make is that *industry insiders* might be confused as to whether NUBO products have anything to do with NuboNau, but those people are not consumers, and they are probably *un*likely to be confused, anyway.  Unlike the consumer, who makes a purchasing decision based on rather limited, superficial information that pops out on a product's packaging or in its advertisement, a cosmetics buyer for a retail chain has a highly developed sense of who its suppliers are and how their products are differentiated.  Ms. Saxby, the Bergdorf Goodman cosmetics buyer, would well understand that NB Labs is based in the United Kingdom and is a completely different company from the San Diego-based NuboNau.  She would also be perfectly able to distinguish their respective products.